2012 Ark. App. 530

**Andrea CHURCHILL & Daniel Churchill, Appellants**

v.

**ARKANSAS DEPARTMENT OF HUMAN SERVICES & Minor Children, Appellees.**

No. CA 12–310.

Court of Appeals of Arkansas.

Sept. 26, 2012.

**638**

Lilly Law Firm, by: Martin E. Lilly, Jonesboro, for appellant.

Tabitha B. McNulty, Office of Chief Counsel, for appellee.

Bristow & Richardson, PLLC, by: Melissa B. Richardson, attorney ad litem for minor children.

DAVID M. GLOVER, Judge.

Andrea and Daniel Churchill appeal from the trial court's decision that their two children, R.C. (DOB 1–12–08) and E.C. (DOB 5–7–11), are dependent-neglected. They challenge the sufficiency of the evidence supporting that decision. We affirm.

According to the affidavit of facts supporting the petition for emergency custody and dependency-neglect, on July 5, 2011, Andrea took E.C., the younger of the two children, to see Dr. Robin Williams because the child had been vomiting. As a result of the doctor's examination, E.C. was determined to have lost weight since his last well-child visit; he had three bruises on his face, which Andrea explained were caused by R.C.'s kissing him, but the doctor found that explanation to be inconsistent with the bruising; and E.C. had indications of a rib fracture. E.C. was admitted to the White River Medical Center, where he underwent a CAT scan, x-ray, and lab work. The scan established that E.C. had suffered a skull fracture, rib fractures, and retinal hemorrhage. Andrea and Daniel gave differing accounts about how the injuries might have happened. ADHS placed a seventy-two-hour hold on both children. R.C. was placed in a foster home, and E.C. was taken to Arkansas Children's Hospital on July 6, 2011. A petition for emergency custody and dependency-neglect was filed on July 8, 2011, alleging that the two children were dependent-neglected "as a result of abuse, neglect, and parental unfitness. . . ."

The dependency-neglect adjudication hearing was held on September 20, 2011. The trial court heard testimony from Brooke Junkersfeld (investigator with the Crimes Against Children Division of the Arkansas State Police), Robin Williams, M.D. (E.C.'s pediatrician), Karen Farst (UAMS pediatrician, board-certified in general pediatrics and child-abuse pediatrics), and Andrea Churchill.

Junkersfeld testified that she interviewed Andrea and Daniel concerning E.C.'s injuries. Andrea offered the explanations that R.C. might have bumped E.C., or gotten into E.C.'s crib and caused the injury; and that the rib injury possibly resulted from bathing E.C. in the sink. Daniel told her that he had fallen twice in the last two weeks while holding E.C., one time with E.C. landing on the couch and the other time with E.C. hitting his head on one of the crib posts but landing in the crib, leaving a red mark on E.C.'s head; that E.C. had rolled off the couch once; and that he had left the children alone and unsupervised for ten- to fifteen-minute periods. Junkersfeld concluded that E.C. had been abused and medically neglected.

Dr. Williams testified that she was E.C.'s pediatrician and that she began seeing him at the time he was born. She explained that Andrea brought E.C. to her clinic on July 5, 2011, because E.C. had been vomiting for three days, had bleeding gums, and had bruises popping up spontaneously. Dr. Williams stated that she had seen E.C. twice before in the clinic, on May 20, 2011, for a well-child check up, and on June 20, 2011, for a cold and facial bruising. She explained that at the June 20 visit, E.C. had a bruise on his forehead, a swollen lip, and a bruise on his lip, which Andrea claimed happened when R.C. dropped him from the swing.

Dr. Williams testified that she admitted E.C. on July 5 to give him fluids for the vomiting; that she observed and felt things in examining E.C. that made her think he had fractured ribs; and that she ordered a chest and head x-rays and blood work. She stated that Andrea mentioned concern about broken ribs prior to knowing about any such injury. Williams testified that E.C. had lost two ounces of body weight; that such a weight loss was abnormal for a child his age; that his weight gain had been good until the July 5 exam; and that she was also concerned about the bleeding gums. She stated that Andrea had switched E.C. to formula when she returned to work. Dr. Williams said that she admitted E.C. to the hospital because she was concerned about the vomiting and weight loss, was not sure what was causing it, and was worried about a head injury or other possible undiscovered injuries. She explained that the x-rays revealed rib fractures and a skull fracture; that the rib fractures were all the way through the rib bones; that such fractures were troubling because an infant's bones are flexible and hard to break; and that Andrea did not really have a satisfactory explanation for the injuries. Dr. Williams stated that while it was possible for the baby's skull fracture to have occurred during the fall described by Daniel, she had seen many skull fractures and could not recall one from simply falling with an infant. She said that she also could not imagine a rib fracture occurring from a fall because infant bones are flexible and that E.C.'s fractures were acute and likely had occurred within the last few days. She also stated that the eye exam revealed a large retinal hemorrhage in E.C.'s left eye and that she had not seen a retinal hemorrhage in a newborn absent child abuse. She said that she did not believe E.C.'s facial bruises were accidental because of their location. She testified that if they were the result of a fall, they would be on the extremities, e.g., the nose, chin, or brow line. Instead, these bruises were fingerprint-size next to the nose and on the forehead. She also said that these bruises were different from the ones that Andrea claimed had happened when R.C. dropped E.C. when removing him from the swing. Dr. Williams stated that the bruises were peculiar in shape and placement; that E.C. continued to vomit throughout the day; and that she kept him on IV fluids but stopped his oral feedings. She had E.C. transferred to Arkansas Children's Hospital on the morning of July 6 because she was concerned that he was suffering from an "inorganic" failure to thrive because of his head injuries, and she believed the rib fractures, skull fracture, and retinal injuries were characteristic of shaken baby syndrome and wanted everything checked out at Children's Hospital.

Dr. Karen Farst, a member of the children-at-risk team from Children's Hospital, testified that she saw E.C. when he was admitted. She explained that the at-risk team includes a social worker and a pediatrician, such as herself, who is trained in child-abuse pediatrics. She also testified that E.C. had significant injuries, with no history of how they had occurred, including fractures in the ninth, tenth, and eleventh ribs on the right side of his body with a "deformity" associated with them in the "posterior aspect," i.e., where the ribs come in contact with the backbone; and that such acute rib fractures were uncommon because infant ribs are very pliable. A follow-up x-ray confirmed that the July 6 x-rays showed acute rib fractures, and not fractures from birth. She said that follow-up x-rays also confirmed the July 6 x-ray showing a skull fracture. She testified that she tested E.C. for any possible hereditary conditions that might otherwise explain his injuries, e.g., the tests ruled out

bleeding disorders, bone diseases, and vitamin deficiencies. She explained that the facial bruising was not normal because E.C. was too young to be mobile and could not really do anything to injure himself.

With respect to the fractured ribs, Dr. Farst testified that it was very uncommon for an infant to have that type of injury without a high-force event, such as a car wreck, and that it would have required some force to cause those rib fractures. She said the mechanism for those types of injuries would be to compress the front and back of his rib cage at the same time. She also explained that if a child receives a blow to the chest or is flat on a surface and gets compressed in one direction, the area of break will be in the lateral or anterior area of the rib cage. She said that someone squeezing a child in their arms as they fell might compress both the front and back at the same time, but that it would require a significant event to cause those types of injuries; however, there was no history of E.C. suffering a major trauma. She said that E.C. had obvious fractures; that his rib fractures could be felt upon examination; and that he had a tender area that "crackled like Rice Krispies" when touched. She testified that his rib fractures were more severe than she commonly sees in infants—even though overall rib fractures are not that common in infants. She stated that E.C. showed obvious discomfort when she handled his chest or back; that he had some swelling in the area but no bruises; that it was very unusual for rib fractures to be obvious from a physical exam; and that it was apparent E.C. had something wrong with his rib cage.

Dr. Farst also explained that it was uncommon to see a retinal hemorrhage in a child who had a short fall or some routine event; and that such hemorrhages are more common in children suffering a high-

er force event, such as falls from greater heights or car wrecks. She said that the "whole constellation together," i.e., the retinal hemorrhage combined with the skull and rib fractures, made E.C.'s case very concerning.

Dr. Farst testified that she was not able to precisely place a date on E.C.'s injuries; that uncomplicated bruises usually go away within seven to ten days; that the skull fracture had probably occurred within a couple of weeks; that retinal hemorrhages usually heal within four to six weeks; that the rib fractures had likely occurred within the week, providing the most narrow time frame; that E.C. was clearly in pain beyond that of a normal fussy baby; and that it would be expected for him to exhibit those symptoms at the time the injury occurred. She described his injuries as serious.

Dr. Farst noted that E.C. was a difficult feeder, but that it was not known whether the feeding issues arose from his rib pain or other problems; and that she did not have strong concerns about failure to thrive issues, did not include it as part of her diagnosis, and did not have much of E.C.'s primary-care history. She offered her opinion that the amount of time a parent waits before seeking medical treatment for a child who is throwing up depends upon the severity of the symptoms; that if they are spitting up some but still making wet diapers and still able to take their bottle, then that situation could probably be handled as a follow-up with their regular doctor; but that if the baby is vomiting out all of the volume being put in and not having wet diapers and not having good activity, then that would be a more emergent evaluation.

Dr. Farst explained that it was uncommon to see *any* fracture in an infant; that she had observed skull fractures that occurred when young children tried to pick

up infants and fell; but that she had never seen a rib fracture this severe caused by a sibling. She explained that a fall would not be the mechanism one would expect to cause this type of rib fracture because of the compression that would have been necessary; that it had never been her experience for the type of severe injuries suffered by E.C. to be caused by a minimal household event; that to sustain the retinal hemorrhage and skull fracture, a traumatic event would be necessary; and that to suffer the rib fractures, a high-force trauma was required.

Andrea Churchill, the children's mother, testified. She explained that E.C. started showing signs of real difficulty from Friday, July 1, 2011, through Tuesday, July 5, 2011. She stated that she had been switching him from breast milk to formula and that he began spitting up. She described his symptoms as "spitting up," not vomiting, and that she did not use the term "retching," even though she heard Dr. Williams describe E.C. as "retching." She accused Dr. Williams of lying about E.C. retching so much when they attempted to feed him at the hospital that Williams was afraid it was caused by a brain injury. She testified that she was still changing wet diapers on E.C. when she took him to see Dr. Williams; that on Sunday, July 3, E.C. was not eating as much as he had; that she worked all day on the Fourth of July; that when she got home that night, E.C. was crying in his crib; that she did not notice anything different except that he was a little extra irritable; that she was able to get him to sleep; and that she took him to the doctor the next morning.

Andrea denied knowing how E.C. was injured. She recalled that approximately two weeks before July 5, 2011, R.C. had dropped E.C. when he was pulling him from his swing, and that she had discussed that incident with Dr. Williams at an office visit. She acknowledged that the injuries had to have occurred when E.C. was with either her or Daniel because they were his only caretakers; and that nothing gave her any reason to believe that Daniel had neglected E.C. or that E.C. had been abused.

At the conclusion of the hearing, the trial court adjudicated E.C. and R.C. to be dependent-neglected.

In dependency-neglect cases, the standard of review on appeal is de novo, but we do not reverse the judge's findings unless they are clearly erroneous or clearly against the preponderance of the evidence. *Lipscomb v. Arkansas Dep't of Human Servs.*, 2010 Ark. App. 257, 2010 WL 961547. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Id.*

A dependent-neglected juvenile includes one who is at substantial risk of serious harm because of abuse, neglect, or parental unfitness to the juvenile or to a sibling. Ark.Code Ann. § 9–27–303(18)(A) (Supp. 2011). Abuse includes a parent's act or omission that constitutes an "injury that is at variance with the history given." Ark. Code Ann. § 9–27–303(3)(A)(iv) (Supp. 2011). Neglect includes a parent's act or omission that constitutes a "[f]ailure to provide for the juvenile's care and maintenance, proper or necessary support, or medical, surgical, or other necessary care," a "[f]ailure to appropriately supervise the juvenile that results in the juvenile's being left alone at an inappropriate age or in inappropriate circumstances, creating a dangerous situation or a situation that puts the juvenile at risk of harm," and a "[f]ailure or refusal to prevent the abuse of the juvenile when the person knows or has

reasonable cause to know the juvenile is or has been abused." Ark.Code Ann. § 9–27–303(36)(A) (Supp.2011).

▪ At the adjudication stage, the trial court is concerned with whether the child is dependent-neglected; which parent committed the acts or omissions constituting neglect or abuse is not the issue. *Howell v. Arkansas Dep't of Human Servs.*, 2009 Ark. App. 612, 2009 WL 3028987. Moreover, a parent cannot avoid the legal consequences of a finding of dependency-neglect just because some of the acts or omissions might have been the fault of others. *Id.*

▪ Here, in appealing the dependency-neglect adjudication to this court, the parents contend that the trial court made its decision based on two clearly erroneous findings: 1) medical neglect against the mother, Andrea, because there "was no evidence that she failed or refused to provide E.C. with any necessary medical care"; and 2) inadequate supervision against both parents because there was no evidence that the parents ever left E.C. alone. We find no clear error in the trial court's dependency-neglect determinations.

The Churchills' argument about the sufficiency of evidence to support medical neglect focuses on E.C.'s symptoms of throwing up, and they argue that because Andrea took E.C. to the doctor out of concern about those symptoms, her actions cannot constitute medical neglect. The argument essentially ignores the evidence that, while the mother described E.C.'s vomiting as "spitting up," Dr. Williams described it as "retching," and that she was so concerned about it and E.C.'s significant weight loss, that she admitted E.C. to the hospital and started replenishing his fluids. The trial court did not have to believe Andrea's testimony that E.C. was merely "spitting up."

Moreover, the trial court was much more concerned with Dr. Farst's testimony about E.C.'s injuries. Dr. Farst described E.C. as being in visible pain that was beyond that of a normal fussy baby; that his rib fractures could be felt; and that his back actually "crackled" when touched. Dr. Farst stated that injuries of that sort could not happen without the caregiver being aware that something had happened to the child, and yet Andrea did not mention the injuries when she took E.C. to the doctor for vomiting, other than to vaguely mention that something might be wrong with his ribs. Dr. Farst testified that the injuries had to be the result of a high-force trauma—a memorable event—and the caregiver would have had to know E.C. suffered the trauma; yet no one sought medical care for E.C. immediately after whatever event caused his injuries, which consisted of multiple rib fractures, a skull fracture, bruises, and retinal hemorrhaging. We recognize that in our de novo review, we could hold alternatively that other grounds for dependency-neglect were met, *see Smith v. Arkansas Dep't of Health & Human Servs.*, 100 Ark.App. 74, 264 S.W.3d 559 (2007), but we find it unnecessary to do so because we find no clear error in the trial court's finding of medical neglect.

▪ With respect to inadequate supervision by both parents, we again find no clear error. Dr. Farst testified that the type of injuries suffered by E.C. could not have been sustained without the caregiver knowing what caused them. With Andrea and Daniel being the only caregivers, they clearly were not adequately supervising E.C. for him to have suffered that degree of injuries. Contrary to their argument in rebuttal—that the actual offender has to be identified—they are simply

not correct. *See Howell v. Arkansas Dep't of Human Servs., supra.*

Following our de novo review of this case, we are not left with a definite and firm conviction that a mistake has been committed by the trial court in finding E.C. and R.C. to be dependent-neglected.

Affirmed.

VAUGHT, C.J., and MARTIN, J., agree.