BART F. VIRDEN, Judge
Irasema Arazola appeals the Craighead County Circuit Court order awarding permanent-relative custody of two of her minor children to their grandparents, Gabriel and Emma Garfias. We affirm.
I. Relevant Facts
On June 25, 2017, the Arkansas Department of Human Services ("Department") exercised an emergency hold on Arazola's three children, AF (11/18/02), AA (9/20/10), and CA (3/27/09). In the emergency petition, the Department asserted that it had received a phone call from the Jonesboro Police Department in regard to an allegation of sexual abuse of CA by Arazola's boyfriend, Francisco Cordova. The children's maternal aunt made the allegation, and all three children confirmed the aunt's claim that Cordova had touched CA's genitals. Investigator Leann Vannan and family service worker Tina Green went to the home to conduct a safety assessment. When questioned, Arazola denied that Cordova had sexually abused CA; however, she reluctantly agreed to a protection plan. Arazola submitted to drug testing, which she passed, though she admitted using marijuana. Guns were found in the home, and Arazola claimed that they belonged to her and not Cordova. The serial numbers on the guns matched those that had been reported stolen, and both Arazola and Cordova were arrested. An emergency hold was placed on the children for suspected sexual abuse and for failure to adequately supervise. On June 29, 2017, the circuit court entered an ex parte order for emergency custody based on the allegations in the affidavit.
On July 14, 2017, the circuit court entered a probable-cause order in which it found that the removal of the juveniles from Arazola's custody was necessary to protect their safety and that it was in the best interest of the children to remain in the custody of the Department. Specifically, the circuit court found that the alleged sexual abuse, Arazola's denial of the abuse, and her love for Cordova were concerning. Although Cordova was incarcerated at that time, the circuit court found that it would be harmful to the children if they were returned to Arazola because the lease to the family home was in Cordova's name and he would return there on his release.
On October 2, 2017, the circuit court entered an adjudication order stating the goal as reunification with Arazola with a concurrent goal of permanent-relative custody. The circuit court found by a preponderance of the evidence that the juveniles were dependent-neglected based on Arazola's *38 failure to take reasonable action to protect CA from sexual abuse perpetrated by Cordova. The court's determination was also based on Arazola's admission of drug use.
On November 21, 2017, the circuit court entered a review order allowing Arazola to have visitation supervised by the Garfiases and finding that Arazola had complied with the case plan and the orders of the court. The circuit court ordered that trial home placement with AA and CA could begin, and it found that if things continued to go well in therapy, AF, who had been living with her maternal aunt, Gabriela Wager, could also begin trial home placement.
On February 22, 2018, the circuit court entered a review order in which it found that trial home placement had begun about two weeks earlier and that AA and CA could continue in trial placement. A permanency-planning hearing was set for April, but it was continued until May 31, 2018.
On May 31, 2018, the circuit court held the permanency-planning hearing. At the hearing, caseworker Felicia Kirksey explained that an emergency staffing was held on April 3 due to a report from the prosecutor's office that Arazola had requested that the no-contact order be lifted so that she could marry Cordova.[1] At the time, Cordova was incarcerated for possession of firearms by certain persons, theft of property, criminal use of a prohibited weapon, and possession of drug paraphernalia. The charges of second-degree sexual assault and third-degree domestic battery had been nolle prossed. The Department submitted a court report stating it had received information that Arazola had allowed AA and CA to talk to Cordova on the phone in violation of the no-contact order. Kirskey explained that initially Arazola denied that any phone calls had taken place between her and the children and Cordova, and she denied that she had plans to marry Cordova. Eventually, Arazola admitted that she had spoken to Cordova on the phone between twelve and sixteen times and that the children were involved in some of the phone calls. A transcript of one phone call was submitted to the court, and though it was not dated, Kirksey stated that she believed that the call took place after the emergency staffing because Cordova and Arazola discussed the matters discussed at the staffing. Kirksey testified that Arazola encouraged Cordova to continue to write letters to her and the children under a false name but that she instructed him not to call until after her court date.
Kirskey testified that at the emergency staffing, Arazola agreed to change her phone number, to cease phone contact with Cordova, and to deliver Cordova's property to his attorney. Arazola did change her number, and Kirksey testified that Cordova's property had not been delivered to his attorney but that Arazola told her the property had been delivered to his family. Arazola told Kirksey she had changed the lease, which was now in her name, but Arazola had not provided proof of the change. Kirksey also testified that Arazola had put $ 800 into Cordova's commissary account, although she claimed the money had been from Cordova's tax refund.
Kirskey testified that after the staffing, CA had begun acting out and had been aggressive toward other children at school and that she believed the change in his *39 behavior was due to his contact with Cordova. A home study showing that the Garfiases' home was appropriate for AA and CA was also submitted to the court, and Kirksey also testified that she believed that the Garfiases were an appropriate placement for the children. She recommended supervised visitation with Arazola.
The Department also presented a CASA report filed on May 23, 2018, regarding AA and CA and their potential placement with the Garfiases. The CASA report stated that CA's "demeanor changes when we talk about being at home. He was uncomfortable when he was asked [about] his mother letting/asking him to talk to Frank." The report also provided that AA told the CASA volunteer that she does not feel safe at home. CASA volunteer Felicia Patterson testified that about a week before the emergency staffing, she spoke to AF, who mentioned that her mother planned to marry Cordova and have children with him. Patterson explained that when she tried to talk to CA about Cordova, he became quiet and reserved and that CA "just stopped talking." Patterson stated that since the April 3 staffing, CA's behavior at school and his grades had deteriorated. Patterson explained that CA had not recanted his statement to her that Cordova had sexually abused him and that she believed the children were being pressured by their mother "to say certain things" and that "they look for her approval before they do anything." Patterson stated that Arazola blamed her parents, her sister, and AF for her current situation.
Arazola testified at the hearing that she initially had denied having violated the no-contact order but that she later admitted the phone calls with Cordova had occurred and that the children had been on speaker phone during the conversations. Arazola stated that she was aware that CA had stated that Cordova sexually abused him but that she did not believe Cordova was a dangerous person for her children to be around and that she had not gotten "the full evidence" regarding the allegations of sexual abuse. Arazola testified that she had ceased all contact with Cordova, that she had returned his belongings to his family, and that she had changed her phone number. Arazola denied telling Cordova to write her letters using a false name. Arazola explained that though Cordova considered her his fiancée, she did not feel the same way. During Arazola's testimony the following colloquy occurred:
ATTORNEY AD LITEM : I've listened to, oh gosh, probably four hours' worth of conversations, at least, between you and Frank. In every conversation, you guys talk about getting married, starting your family. He's going to buy you a washer and dryer when he gets out. So, you're denying all that?
ARAZOLA : That's all-like I said, it's true what he said, but it doesn't mean that was going to happen.
Arazola also testified that she did not support the Department's recommendation to change to goal of the case from reunification to permanent-relative custody with the Garfiases because her stepfather, Gabriel Garfias, had sexually abused her, and her mother had not done anything about it.
Arazola's oldest child, AF, testified that she had never considered Cordova a father figure and that she had been uncomfortable around him when she and her siblings had lived with him because he had brought men into the home and because he drank alcohol. AF told the court that she believed her grandparents could provide a safe, stable home and a healthy environment and that she did not worry that her grandparents could protect CA. AF described the Garfiases as "really good" and opined that "they'll do anything for those kids to stay *40 together." AF stated that she did worry about her grandparents' safety because "my mom, she can lose her temper fast." AF recounted that she had told the CASA worker that AA had informed her that she and her brother were talking to Cordova and that things with Arazola were "not good."
Based on the parties' stipulation, the court ordered that AF remain in the permanent custody of her aunt. As to AA and CA, the circuit court changed the goal to permanent-relative custody with their grandparents, and Arazola was allowed supervised visitation. The circuit court based its decision on Arazola's intent to reunite with Cordova on his release from prison. The circuit court found that Arazola posed the potential for harm to the juveniles because she had violated the no-contact order by allowing the children to have contact with Cordova.
On July 9, 2018, the circuit court entered a case-closure order. The court stated that it had considered all the evidence and testimony and the best interest of the children, and it found that the juveniles did not require further Department services, that the Department had made reasonable efforts to provide family services, and that the case was closed. Arazola filed a timely notice of appeal.
II. Issues on Appeal
A. Permanent-Relative Custody
On appeal, Arazola argues that the evidence does not support the circuit court's decision to abandon the goal of reunification and award permanent custody to the Garfiases because the Department did not prove by a preponderance of the evidence that Arazola posed a danger to the juveniles' safety. We disagree and affirm.
The burden of proof in dependency-neglect proceedings, including permanency-planning hearings, is by a preponderance of the evidence. Anderson v. Ark. Dep't of Human Servs. , 2011 Ark. App. 522, 385 S.W.3d 367 (citing Ark. Code Ann. § 9-27-325(h)(2)(B) (Supp. 2017) ). The standard of review is de novo, but we, giving due deference to the circuit court's superior position to observe the parties and judge the credibility of the witnesses, will not reverse the circuit court's ruling in a dependency-neglect case unless the ruling was clearly erroneous or clearly against the preponderance of the evidence. Churchill v. Ark. Dep't of Human Servs. , 2012 Ark. App. 530, 423 S.W.3d 637. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. Id. Deference to the circuit court is even greater in cases involving child custody, as a heavier burden is placed on the circuit court to use to the fullest extent its powers of perception in evaluating the witnesses, their testimony, and the best interest of the children. Ashcroft v. Ark. Dep't of Human Servs. , 2010 Ark. App. 244, 374 S.W.3d 743.
Arkansas Code Annotated section 9-27-338 lists the permanency goals that a circuit court can consider at the permanency-planning stage of dependency-neglect cases. The goals are listed "in order of preference," and the court must select a goal based on the best interest, health, and safety of the juvenile. Ark. Code Ann. § 9-27-338(c).
The first goal is placement of the juvenile with a fit parent. Ark. Code Ann. § 9-27-338(c)(1). The second goal is to return the juvenile to the guardian or custodian from whom the juvenile was initially removed. Ark. Code Ann. § 9-27-338(c)(2). The third goal allows the court to authorize *41 a plan to place custody of the child with a parent if (1) the parent is complying with the case plan and making measurable progress; (2) the parent is making significant progress toward remedying the conditions that caused removal or that prohibited the placement of the juvenile in the home; and (3) the return of the juvenile will occur within three months. Ark. Code Ann. § 9-27-338(c)(3)(A)-(B) ; Lansdell v. Ark. Dep't of Human Servs. , 2016 Ark. App. 433, at 8, 502 S.W.3d 579, 583. For the third goal, the burden is "on the parent to demonstrate a genuine, sustainable investment in completing the requirements of the case plan and following the orders of the court in order to authorize a plan to return or be placed in the home as the permanency goal." Ark. Code Ann. § 9-27-338(c)(3)(iii). The fourth goal authorizes the Department to file a termination petition in the case, and the fifth goal authorizes a plan for a permanent guardian.[2] The sixth goal is permanent custodial placement with a "fit and willing relative." Ark. Code Ann. § 9-27-338(c)(6). A circuit court may bypass the first three goals and move to the sixth goal if there is evidence that placement with a parent poses a danger to the juvenile's safety. Lansdell, supra. The burden of proof in a permanency-planning hearing is preponderance of the evidence. Ark. Code Ann. § 9-27-325(h).
Arazola's argument that the circuit court erred in its potential-harm finding is twofold. First, she contends that the Department did not prove that she had a continued relationship with Cordova after the April 3 emergency staffing. Second, she argues that the Department's assertion that she posed a danger to AA's and CA's safety is undermined by the fact that it did not see fit to remove the children from her custody after it was discovered that she had violated the no-contact order. Neither argument has merit.
Arazola asserts that the Department's contention that the phone call occurred after the court's instruction to cease contact with Cordova is speculative and amounts to argument of counsel. Arazola explains that without a date stamp on the transcript of the phone call, the Department cannot prove that the phone call took place after the April 3 emergency staffing; thus, there is insufficient evidence to support the court's determination that she continued to have a relationship with Cordova after she had been told to end it.
Whether the transcript of the phone call bears the date of the phone call is irrelevant to our review and amounts to a request for the appellate court to determine the credibility of the witnesses, which we do not do. See Churchill, supra. We hold that the evidence and testimony supporting the circuit court's potential-harm finding is sufficient. At the permanency-planning hearing, the circuit court heard testimony that on March 28, 2018, Arazola went to the prosecutor's office to have the no-contact order lifted so that she could marry Cordova. The transcript of the phone conversation shows that Arazola recounted to Cordova that she had gone to the prosecutor's office to have the no-contact order lifted. It appeared that the prosecutor's office must have called the Department because the Department then went to AA and AC's school to investigate whether there had been a violation of the order. During the phone call, Arazola explained that she was in danger of having the children taken away from her because of her violation of the order. She instructed Cordova that he should "[o]nly write to us" and to use his aunt's name when he wrote the letters. She also told Cordova, "[D]on't call us until after my *42 court" and that "when this is finished in court, I'll tell you more." Arazola and Cordova discussed the difficulties of getting married under the circumstances, and at one point, Arazola questions Cordova, "So then you don't want to be with me anymore or what?" Cordova assures Arazola, "I didn't say that." Other evidence also supports the court's finding that Arazola continued to have a relationship with Cordova. AF testified that her mother planned to marry Cordova as soon as he was released from prison. Felicia Kirksey testified that Arazola had put money into Cordova's commissary account and that Cordova's name was still on the lease on the house in which Arazola lived-where Cordova was to live upon his release from prison. At the permanency-planning hearing, Arazola testified that she did not intend to marry Cordova; however, she insisted that he was not a dangerous person for her children to be around and that she never "got the full evidence" regarding Cordova's sexual abuse of CA.
The crux of Arazola's sufficiency argument is that there was no proof that she continued to have a relationship with Cordova after the emergency staffing; however, both the transcript of the phone call and the testimony of the witnesses offered contradictory evidence. It is well settled that we will not reweigh the evidence on appeal, and credibility determinations are left to the circuit court. Newman v. Ark. Dep't of Human Servs. , 2016 Ark. App. 207, 489 S.W.3d 186. In light of the evidence and testimony presented at the hearing, the circuit court's determinations that Arazola had not abandoned the relationship with Cordova and that that relationship posed a potential for harm to AA and CA are not clearly erroneous.
Arazola also asserts that the Department left the children in her care for two months after it was clear that she had violated the no-contact order and that the Department's inaction was proof that "at no time prior to the permanency-planning hearing did the Department feel that [she] was incapable of safely parenting her children, such that the children needed to be removed from the home." Again, she asks the appellate court to give greater weight to the evidence of the Department's decision to allow the children to remain in her custody until the conclusion of the permanency-planning hearing. We cannot say that the circuit court clearly erred in its determination that Arazola posed a potential for harm to the children if returned to her custody, and we affirm its decision to bypass the first five goals set forth in Ark. Code Ann. § 9-27-338(c) and grant permanent-relative custody.
B. Best-Interest Determination
Arazola also contends that there is insufficient proof to support the circuit court's finding that it was in AA and CA's best interest to award permanent custody to the Garfiases.
Specifically, she asserts that because the Garfiases were never called as witnesses or made parties to the case, the circuit court "had no opportunity to evaluate the couple before placing two young children in their home." Arazola cites no authority for her contention that custody can only be awarded to parties within the case and that the potential custodians must testify at the hearing to obtain custody. When a party cites no authority or convincing argument on an issue, and the result is not apparent without further research, the appellate court will not address the issue. McKinney v. Ark. Dep't of Human Servs. , 2017 Ark. App. 475, at 17, 527 S.W.3d 778, 789.
Moreover, Arazola's best-interest argument is a request for this court to reweigh *43 the evidence. Arazola contends that Gabriel Garfias's clear background and maltreatment-registry check, the approved home study, the family service worker's testimony that the Garfiases could provide an appropriate home, the favorable CASA report, the court's finding that the grandparents and the children have a close relationship, and AF's testimony that she believed her siblings were safe in their grandparents' home constitute scant evidence of the Garfiases' fitness and ability to care for the children. As we stated above, we will not reweigh the evidence on appeal, and credibility determinations are left to the circuit court. Newman, supra.
Affirmed.
Klappenbach and Whiteaker, JJ., agree.

Christy Wilson of the Craighead County Deputy Prosecuting Attorney's Office testified at the hearing that on March 28, 2018, Arazola came to the prosecutor's office requesting that the no-contact order be lifted so that she and Cordova could get married. Wilson testified that it was explained to Arazola that the judge who issued the order was the appropriate person to lift the order.

Neither the fourth nor fifth goal is applicable to this case.