Cite as 2021 Ark. App. 177

# ARKANSAS COURT OF APPEALS
DIVISION IV
**No.** CV-20-490

| | |
|---|---|
| MICHAEL GORDIN MADDIN<br><br>APPELLANT<br><br><br>V.<br><br><br><br>ARKANSAS DEPARTMENT OF<br>HUMAN SERVICES<br><br>APPELLEE | Opinion Delivered: April 21, 2021<br><br>APPEAL FROM THE FAULKNER<br>COUNTY CIRCUIT COURT<br>[NO. 23PR-20-143]<br><br>HONORABLE DAVID M. CLARK,<br>JUDGE<br><br>AFFIRMED |

## ROBERT J. GLADWIN, Judge

On July 9, 2020, the Faulkner County Circuit Court ordered long-term protective custody of Michael Gordon Maddin, an adult. Maddin appeals arguing that the circuit court erred in finding that his health and safety are in imminent danger and that he is unable to provide for his own protection from maltreatment. We affirm.

## I. *Facts*

The Arkansas Department of Human Services (DHS) filed a petition for emergency custody on March 11, 2020, alleging that Maddin was an endangered or impaired adult under the Adult Maltreatment Custody Act. Ark. Code Ann. §§ 9-20-101 et seq. (Repl. 2020). In an attached affidavit, DHS alleged that a referral was received by Adult Protective Services, and the reporter had stated that Maddin was a fall risk, had fallen down, and was not taking care of himself; Maddin's bed was covered in feces, and he was stuck in it; there

were pills all over the house and on the floor; Maddin had five-gallon buckets full of urine; Maddin was defecating on the floor and covering it in cat litter; and Maddin was possibly taking too much medicine.

The affiant stated that on March 9, a DHS agent investigated and found Maddin alone in his apartment with the door open, sitting in his wheelchair. Maddin stated that he was ready for an appointment, and he had bowel movement on his legs, his shoes, and the bottoms of his feet. Police were called when Maddin became loud and verbally aggressive, and Maddin locked his door, not allowing the officers inside. Ultimately, the fire department was called, and firefighters forced entry into Maddin's home.

The affiant stated that records showed Maddin had been involved in five police-incident reports between June 24, 2019, and March 1, 2020; thirty-six calls "obtained per CFS History and Search Detail"; and twenty-four assist calls were made to the Conway Fire Department between February 26, 2019, and March 1, 2020. The affidavit states that Maddin has type 2 diabetes, hypertension, heart failure, atherosclerotic heart disease, atrial fibrillation, abnormalities of gait and mobility, weakness, unsteadiness of feet, cognitive communication deficit, acute kidney failure, sleep apnea, gastro-esophageal reflux disease, chronic gout, and ulcerative colitis. The affidavit concludes that DHS placed a seventy-two-hour hold on Maddin because he did not have the physical capacity to protect himself from abuse, neglect, or exploitation and that he required twenty-four-hour care, which could only be provided in a long-term-care facility.

On March 11, an ex parte order granting DHS emergency, protective custody of Maddin was filed. The order reflects that the court found Maddin indigent, and a public defender was appointed.

Dr. Gil Johnson examined Maddin and reviewed his medical records on February 24, 2020, and Maddin was diagnosed as morbidly obese with a secondary diagnosis of diabetes mellitus. Dr. Johnson opined that Maddin requires twenty-four-hour care in a long-term-care facility; that Maddin is not mentally impaired; that Maddin is physically impaired; and that Maddin does not have the mental capacity to protect himself from abuse, neglect, or exploitation. Dr. Johnson recommended that Maddin remain in DHS protective custody and that he not attend a court hearing due to chronic pain and an inability to ambulate in a wheelchair.

Dr. Scott Simmons examined Maddin on March 11, and he recommended that Maddin have institutional care for medication management and administration, safety monitoring and assistance, and basic hygiene. Dr. Simmons found that Maddin is mentally and physically impaired and does not have the mental capacity to protect himself. He recommended that Maddin remain in protective custody and that Maddin not attend a court hearing because he would not understand the court proceedings and attending would cause him undue stress and anxiety.

A probable-cause hearing was held on March 17, and the court found that Maddin had no caregiver responsible for his protection, care, or custody and that probable cause continued for custody to remain with DHS. The court found that Maddin has a mental or

physical impairment that prevents him from protecting himself from imminent danger to his health or safety.

A psychiatric evaluation on May 15 noted that Maddin weighed 422 pounds. The evaluation plan stated: (1) consider a nutrition consult due to obesity; and (2) Maddin is cognitively safe to return to his home.

At a hearing on June 16, Tashimma Lacy testified that she is a day nurse at Cottage Lane Health & Rehab, where Maddin resides in protective custody. She administers medication to Maddin and assists him with dressing, transferring, and showering. She said that Maddin is not able to get up and move around without assistance and that he has good days and bad days. She said that he is not able to shower without assistance and that he is receiving physical therapy. She said that Maddin seems to be mentally aware, she does not know of any mental issues that would stop him from caring for himself, and his limitations are physical in nature. She said that Maddin is cooperative in working with her and accepts help if he needs it. On cross-examination, she said that from her observation of his physical therapy, Maddin seems cooperative, and he has progressed in his ability to function day to day.

Captain Clint Smith of the Conway Fire Department testified that before DHS obtained custody of Maddin, he had responded to Maddin's house four times. He said that three of Maddin's calls had been for lifting assistance, and he had twice transported Maddin to a hospital. He said that he had responded to a structure-fire call from Maddin's apartment; however, when firefighters arrived, there was no fire, and Maddin needed help getting up. Maddin told investigators that he had asked his girlfriend to call 9-1-1 because dispatch had

4

blocked his number and address "because of the amount of times we had been" to Maddin's house. He said that every time he went to Maddin's house, there was urine and feces from the front door to the bed, all the way back through the house to the bedroom. He said,

> It was animal and human, and it was not clean. Dishes out. Clothes. Rotting food. That type stuff. Mr. Maddin didn't appear to be clean or in a good state of care. Environmentally, it was not comfortable for me to be in the home when responding to those calls. We would actually wear our fire-fighting gear in the house and wear masks, N95 masks for the odor, the smell. The smell carried with me a little after I left.

He said that he was concerned for Maddin's safety in the home and that his main concern was whether Maddin would be able to get out if necessary. He said that Maddin appeared to be aware of his surroundings, and there were times when Maddin was groggy. He said that he saw pill bottles that were opened and that pills had fallen out. He said that Maddin's neighbor would check on him and visit with firefighters about Maddin and that Maddin's demeanor was "nice," but he had also observed Maddin being very rude. On cross-examination, he said that there had been twenty-seven reports from Maddin's address between January 1, 2019, and June 12, 2020. Each of those times, Maddin or someone at his request had called the fire department for assistance.

Captain Brian Cannon of the Conway Fire Department testified that he had been to Maddin's home about six times on assistance calls. He agreed with Captain Smith's testimony regarding the necessity of masks due to the odor in Maddin's apartment. He said that he was not sure if Maddin had a cat but that there was always cat litter on the floor and "smells connected to that." He said that there were times that Maddin was less coherent than other times. On cross-examination, he said that "lift assist" is a fairly common function of the fire department.

Danny Collins, a firefighter with the Conway Fire Department, testified that he had responded to calls from Maddin's home when Maddin had fallen or needed assistance. He had concerns for Maddin's ability to safely care for himself in the home. He said that the conditions in the apartment "were unlivable" and that Maddin would be unable to get himself out of the house. He said that sometimes Maddin would appear to be in good condition physically and was clean, and sometimes he was not because he had used the bathroom on himself. On cross-examination, he said that despite Maddin's calling the fire department about twice a month, the department would not have stopped responding to him if he were living at home and called for assistance. On redirect examination, he said that there were periods of time when Maddin would go weeks without calling, and in September 2019, Maddin called seven times for assistance.

Janice Mason, a DHS nurse and an adult protective services investigator, testified that she wrote the original affidavit and exercised the seventy-two-hour hold on Maddin. She went to Maddin's home and found feces covered with cat litter in the kitchen, living room, bedroom, and hallway. There was a dog in the home but no cat. She said that she knew Maddin was able to move around in his wheelchair because he locked her and the police out, and through the window, she observed him move into his bedroom and cover the fecal matter on his sheet with his bedspread. She said that police called the fire department to gain entry into Maddin's home that day, that she is aware that Maddin is not happy being in DHS custody, and that she feels bad for him. She said that his cognitive ability is not the reason he needs to be in protective custody and that he has some pretty severe physical

6

limitations. She said that Maddin lives by himself, that he has a girlfriend who lives in Oklahoma with her mother, and that it is not safe for Maddin to return to his home.

Carol Franklin, Maddin's girlfriend, testified that she lives in Sallisaw, Oklahoma, with her elderly mother. She said that she stays with Maddin when she is living part time in Conway—she lives "a fourth of the time" with Maddin and the rest with her mother. She said that Maddin had been staying on his own for about a month when DHS became involved. She said that when she stayed with Maddin, he never had five-gallon buckets in his apartment but that Maddin has a dog that frequently has accidents on the floor. She said that Maddin was able to get into his wheelchair and clean up after the dog and that he would use cat litter "in the manner that some people use floor cleaner." She said that she never saw him put cat litter on feces, but she was sure that he had done so when he was alone. She said that "home health" came to Maddin's home for a period of time when she was staying with him, but they did not provide housecleaning or cooking, and they monitored his health and took his blood pressure. She said that Maddin owns an automobile that he drives and that he has a ramp into his apartment that he is able to use to get out of the apartment by himself. She has never known him to be unable to transfer from his wheelchair to his car, but she did not know if he could do so by himself. She said that she had ridden with him in the car before he became wheelchair bound. On cross-examination, she denied calling in a structure fire to the fire department. She said that with the exception of needing help with transferring sometimes, Maddin "does pretty well."

Maddin testified that he had lived in his apartment in Conway since 2005 and that Denver Prince is his landlord. He said that he had not paid his rent in a couple of months,

that he had contacted Mr. Prince or his assistant, and his apartment was being held for him. His rent is $425, and before DHS took him into custody, he paid his rent a month ahead. He said that he is current on his utility bills and had talked to Conway Corp about DHS "putting a freeze" on his check. He said that he has an automobile, which is licensed and insured with GEICO, his premiums are thirty-nine dollars a month, and he is current on his insurance payments. Maddin said that he makes a regular donation to animal charities, which is important to him, and he has not been able to do that since he has been in protective custody. He receives Social Security disability payments of $992 a month, and he has been disabled since about 1990.

Maddin said that he has a couple of bullets in his spine and that "experts" want to do surgery on his feet. He said that he also needs dental work and has been trying to "work it out" through his insurance company, but he has not been able to obtain dental work because of the COVID lockdown. He has chronic health problems, he uses a CPAP machine for sleep apnea, and he described other problems caused by the bullets moving out of his spine. He is diabetic, takes medication for it, regulates it with diet, and is not insulin dependent. He has some arthritis and gout, and he has trouble breathing. He has problems with his sciatic nerve and chronic pain.

Maddin denied owning any five-gallon buckets and said that he does not have feces all over the floor in his house. He said that there were some feces and urine on the floor because of his dog, and he uses cat litter to soak up the urine so he could scoop it into a plastic bag, and he would then mop the area. He said that the firefighters who testified had lied about animal and dog feces being all over the floor. He said that the day DHS came to

his house, he told the caseworker that he needed to get dressed and that he was going to lock the door. The caseworker then told police and firefighters that he had refused to come out, which he said was a lie. When police came into his bedroom and began pulling him to the front door, he asked them if they had a warrant, and they said no. When he asked them if they knew he was disabled, they put him back on the bed and told him to hurry. He said at the time, he was confined to his wheelchair and unable to walk or stand on his own. He said that he is now able to stand and walk a little, having done some physical therapy. When asked why he had not hired a housekeeper, he said that every time he would apply for that, adult protective services or Janice would have him taken to a facility. Janice told him that where he was going, he would not need anybody for his house. He also said that he is Medicare and Medicaid qualified and that if he could go home after the hearing, he intended to apply for home healthcare for help with medication management and personal-hygiene issues and to hire someone to clean his house. He said that he had been on the phone with Medicare or Medicaid an entire day trying to apply for help, and at 4:30 p.m., "[h]e was hung up on." He said that he is bitter about the situation.

Maddin said that when the photographs of his apartment were taken, he had been in the middle of cleaning. He said that he drives his vehicle and that he has the ability to transport himself in an emergency. He asked that the DHS petition be dismissed and that he be allowed to go home. He said that the therapy he had received had helped him and that he can stand. He said that he would like to "finish that out here" until he can walk. He said that if the petition were dismissed, he intended to stay as a voluntary admission and continue his rehab, and if he needed to go home, he could go home and then come back

and resume his place. He acknowledged that he would not be able to leave the facility and go back due to COVID-19, and he said that he intended to stay for the time being and continue with the physical rehab. Once he is able to walk, he intends to go home.

The circuit court granted DHS's petition, and the July 9 order for long-term protective custody states in pertinent part:

> 3. The Court finds that Respondent, having been found endangered or impaired, lacks the capacity to comprehend the nature and consequences of remaining in a situation that presents an imminent danger to his health or safety. More specifically: Mr. Maddin suffers from a host of physical issues that prevent him from being able to independently care for himself. Mr. Maddin requires significant assistance to carry out tasks related to self-care such as showering, using the restroom, and getting dressed. Prior to coming into DHS custody, Mr. Maddin lived alone and often called the Conway Fire Department or Conway Police Department for emergency assistance when he was unable to get up from his bed or when he had fallen. There were approximately twenty-seven calls to the fire department over an approximately 14-month period of time, including a call that was accepted for a false structure fire, and rescue personnel described Mr. Maddin's home to be environmentally unsuitable for him and a risk to his health and safety, as the home was often littered with feces, urine, and other environmental hazards. Although Mr. Maddin present as lucid and aware of his surroundings, he is unable to appreciate the consequences of self-neglect, and if he were released to go home, he would continue to be in imminent danger.

From this order, Maddin filed a timely notice of appeal, and this appeal followed.

II. *Standard of Review and Applicable Law*

This court reviews probate proceedings de novo, and the decision of the probate court will not be disturbed unless clearly erroneous, giving due regard to the opportunity and superior position of the probate court to determine the credibility of witnesses. *Johnston v. Ark. Dep't of Human Servs.*, 2017 Ark. App. 51, at 6, 515 S.W.3d 620, 623–24. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on

the entire evidence is left with a definite and firm conviction that a mistake has been made. *Yarborough v. Ark. Dep't of Human Servs.*, 96 Ark. App. 247, 240 S.W.3d 626 (2006).

A "maltreated adult" means an adult who has been abused, exploited, neglected, physically abused, or sexually abused. Ark. Code Ann. § 9-20-103(15). "Neglect" includes self-neglect or an act or omission by a caregiver responsible for the care and supervision of an endangered or an impaired adult constituting negligent failure to provide necessary treatment, rehabilitation, care, food, clothing, shelter, supervision, or medical services to an endangered or an impaired adult, or to carry out a prescribed treatment plan. *See* Ark. Code Ann. § 9-20-103(17)(A) & (B)(i), (iii).

DHS or a law-enforcement official may take a maltreated adult into emergency custody if the circumstances or condition of the maltreated adult are such that returning to or continuing at the maltreated adult's place of residence or in the care of a person responsible for the maltreated adult's care presents imminent danger to the maltreated adult's health or safety, and the maltreated adult either lacks the capacity to comprehend the nature and consequences of remaining in a situation that presents imminent danger to his or her health or safety, or has a mental impairment or a physical impairment that prevents the maltreated adult from protecting himself or herself from imminent danger to his or her health or safety. Ark. Code Ann. § 9-20-114(a)(1), (2).

Pursuant to Arkansas Code Annotated section 9-20-117(c), the circuit court may order long-term custody with DHS if the court determines that

> (1) The adult has a mental or physical impairment or lacks the capacity to comprehend the nature and consequences of remaining in a situation that presents an imminent danger to his or her health or safety;

11

(2) The adult is unable to provide for his or her own protection from maltreatment; and

(3) The court finds clear and convincing evidence that the adult to be placed is in need of placement as provided in this chapter.

## III. *Impairment*

Maddin argues that the circuit court erred in finding that his health and safety are in imminent danger and that he is unable to provide for his own protection from maltreatment. *See* Ark. Code Ann. 9-20-117(c). He argues that he is not an impaired adult—one who, as a result of impairment, is unable to protect himself from neglect—because he is able to stand, cooperate, and return home.

He distinguishes his case from *Pardew v. Arkansas Department of Human Services*, 2017 Ark. App. 70, 513 S.W.3d 265, wherein we affirmed an order for long-term custody holding that there was no clear error in the circuit court's finding that Ms. Pardew was an endangered and impaired adult. Aside from the DHS investigator's testimony that Ms. Pardew's dementia and delirium prevented her from properly caring for herself, there were medical records that Ms. Pardew suffered from dementia with delusional features and behavioral disturbances, and a doctor had opined that Ms. Pardew required long-term nursing-home care due to poor self-care skills and poor insight. *Id.* at 6, 513 S.W.3d at 268. Maddin contends that his treating physicians found no mental deficiencies or mental impairment. He concedes that Dr. Johnson initially opined that Maddin was physically impaired and did not have the mental capacity to protect himself. He argues that on May 13, 2020, he was found to be "cognitively safe to return home" by Dr. Simmons. He further points to his own testimony consistent with Dr. Simmons's report. He argues that there is no finding

from Dr. Simmons that he is in a situation that poses a danger to himself and no proof that he demonstrates a lack of capacity to comprehend the nature and consequences of remaining in that situation or condition. He contends that the evidence does not support the required findings and that he is not mentally impaired; he is cognitively safe to return to his home; he is cooperative; he is able to stand; and he has fair judgment.

"Impairment" means "a disability that grossly and chronically diminishes a person's physical or mental ability to live independently or provide self-care as determined through observation, diagnosis, evaluation, or assessment." Ark. Code Ann. § 9-20-103(11). DHS argues that the circuit court's order should be affirmed because Maddin has a physical impairment that prevents him from being able to provide for his own protection from maltreatment and that he is in need of placement in a twenty-four-hour-care facility. *See* Ark. Code Ann. § 9-20-117(c)(1). We agree.

The trial testimony and reports from doctors and first responders supports the circuit court's finding that Maddin has a physical impairment that grossly impairs his ability to live independently and provide self-care and that he presents an imminent danger to himself. The firefighters described the deplorable condition of Maddin's home, Maddin's physical condition, and their concern for his safety and health. Maddin's nurse at the rehabilitation facility testified that Maddin lacks the ability to move without assistance, and the DHS investigator testified to Maddin's being covered in his own feces on the day of removal.

Maddin's request for reversal because his psychological evaluation stated that he was cognitively safe to return home is nothing more than a request for this court to reweigh the evidence. It is well settled that we will not reweigh the evidence on appeal, and credibility

13

determinations are left to the circuit court. *Arazola v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 109, at 13, 573 S.W.3d 35, 42. Further, the psychological evaluation did not negate the other doctors' reports, which recommended that Maddin be placed in long-term custody and that he reside in a twenty-four-hour-care facility. Accordingly, the circuit court's decision is not clearly erroneous.

Affirmed.

BARRETT and HIXSON, JJ., agree.

*Dusti Standridge*, for appellant.

*Ellen K. Howard*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.