

# ARKANSAS COURT OF APPEALS

DIVISIONS III & IV
**No.** CV-16-601

| | |
|---|---|
| ARKANSAS DEPARTMENT OF HUMAN SERVICES<br><br>APPELLANT<br><br>V.<br><br>TOMISHA LEWIS AND MINOR CHILDREN<br><br>APPELLEES | Opinion Delivered March 8, 2017<br><br>APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, TENTH DIVISION<br>[NO. 60JV-16-319]<br><br>HONORABLE JOYCE WILLIAMS WARREN, JUDGE<br><br>AFFIRMED |

## BRANDON J. HARRISON, Judge

The Arkansas Department of Human Services (DHS) appeals an order of the Pulaski County Circuit Court that dismissed DHS's petition for dependency-neglect and closed the case. DHS argues that the circuit court clearly erred and that Tomisha Lewis's children are dependent-neglected as a result of neglect and parental unfitness. We affirm.

On 4 March 2016, DHS filed a petition for emergency custody of three-year-old Z.L., one-year-old L.L., and one-month-old T.U. The accompanying affidavit explained that Tomisha Lewis and T.U.'s father, Tony Ussery, had a heated argument on the staircase outside Ussery's apartment and that the baby, who was strapped in a car seat, inadvertently fell down the stairs. According to one of the responding police officers, the car seat was "turned over on the ground covered in dirt and gravel while the parents were still arguing and fighting." The baby was taken to Arkansas Children's Hospital to be examined, and

the other two children, who were in a car nearby, were seen at the hosptial as a precaution. Both parents were arrested for domestic battery and child endangerment. The affidavit noted that Lewis did not have a permanent residence and stayed with her grandmother, her cousin, or Ussery. The affidavit also noted that Lewis had initally given the police a false name "in hopes that her children would not go into DHS custody." The affidavit expressed concern that T.U. could have been severely injured and that "the children were inadequately supervised as well as left without a caregiver upon the arrest of the mother and father." The Pulaski County Circuit Court issued an ex parte order for emergency custody and, on March 9, found probable cause to continue DHS's custody of the children. The order set an adjudication hearing for April 6.

On that date, the following testimony was presented. Little Rock Police Officer Stephen Lichti testified that on 1 March 2016, at approximately 5:00 a.m., he responded to calls reporting a loud disturbance between a male and a female in the parking lot of an apartment complex. As Lichti turned the corner into the parking lot, he could hear yelling and screaming and observed two people (Lewis and Ussery) at the top of a steep stairwell landing. He rushed up the stairs and physically separated the two, but Lewis continued to charge at Ussery. Lichti saw the baby in the carrier at the base of the stairs, sitting out in the rain; Lichti's partner attended to the baby while he dealt with the parents. According to Lichti, Lewis was more interested in fighting than checking on her baby. Lewis reported to him that she had attempted to leave the baby with Ussery, which is what caused the scuffle: "She took him [the baby] upstairs, knocked on the door, and I guess he [Ussery] opened the door and ran with the child downstairs and put him on the car as she was leaving.

She turned around and brought him back up in the landing at the top, and that's where the—the fight occurred." Lichti also said again that the baby was in the rain, that it was a cold night, and that the baby "had gravel, dust, and dirt on his forehead and kind of in his face area." Lichti explained that Ussery was very intoxicated and that Lewis knew he was intoxicated, because they had spent most of the night together. Ussery reported to Lichti that he [Ussery] heard a loud banging on his door; looked out and saw the carrier sitting outside and Lewis running back to her car; that he grabbed the baby, ran downstairs, and put the baby on her car; and that Lewis grabbed the baby and ran back upstairs, and they proceeded to fight on the landing.

Lewis testified that she had been residing at Dorcas House for about a week and that the children could stay there with her. She also said she was currently not working, under the rules of Dorcas House, but would be able to return to her previous employment. She explained that on the night of the altercation, she and Ussery had been out together and T.U. was with them. At approximately 3:00 a.m., they went to pick up her other two children, who were sleeping at her cousin's house. They all returned to Ussery's apartment, but when they pulled into the parking lot, Ussery said he did not want her and the children to stay there. He told them to leave, Lewis got upset, and she told him that he was going to keep his child (the baby).

> As he went up, I went up behind him. He hurried up and closed the door. I was knocking light at first and he wouldn't open the door so, you know, I began to knock harder; your son, get your son, your son is out here. He came to the door, opened the door. As he opened the door, I, you know, started walking back to the car. He came down, brought him down. I was in the process—after he was getting him in the car, I got back out and bringing him back to him; no, you're going to get your son. . . . We made it to the top of the stairs and when I gave him to him, you know, I turned around,

like, whatever, I'm fixing to go. . . . He say, you take him . . . he set him down. It's just like I said once before, the car seat, it was too big to set on the stairs. . . . [T]he car seat went down.

According to Lewis, the carrier was sitting right side up and had not flipped. She said that T.U.'s car seat being knocked down the stairs was "one of the scariest moments of my life," that she physically "charged at" Ussery in reaction to the fall, and that it was "more so of a tussle than a fight." She also said that during this time, her other two children were asleep in the car. She claimed that she and Ussery were going down the stairs when the police arrived.

On cross-examination, Lewis said that she wasn't really going to leave the baby with Ussery and that she was just angry. She acknowledged that she did not immediately check on the baby when he fell but said that she could see him and "he was setting [sic] there and he was perfectly okay." She also admitted, as we have mentioned, that she lied to the police officers about her name because she did not want her kids to "go to DHS."

DHS asked the court to find the children dependent-neglected as a result of neglect and parental unfitness. Lewis's attorney argued that Lewis had "responded poorly" but that this was not a case of dependency-neglect. The ad litem argued that Lewis had put her emotional needs before those of her children and urged the court to find depedency-neglect.

The court announced it was dismissing the petition, stating, "This is an accident, unfortunate accident. These things happen in a short period of time. I find mom is completely credible. I find mom more credible than the police officer[.] . . . I believe her, she wasn't going to leave the baby. She's trying to make a point." The court also stated that there was "nothing wrong with being out all night long with your children" and that

SLIP OPINION

Lewis had "learned from this situation." The court entered a written order finding that "DHS failed to meet its burden of proof that the juveniles are dependent-neglected." The court ordered the children returned to Lewis's custody and closed the case. DHS appealed.

A dependent-neglected juvenile is one at substantial risk of serious harm as the result of, among other things, abandonment, abuse, or neglect. *See* Ark. Code Ann. § 9-27-303(18)(A)(i), (ii), and (v) (Repl. 2015). Dependency-neglect allegations must be proved by a preponderance of the evidence. Ark. Code Ann. § 9-27-325(h)(2)(B). The standard of review is de novo, but we, giving due deference to the circuit court's superior position to observe the parties and judge the credibility of the witnesses, will not reverse the circuit court's ruling in a dependency-neglect case unless the ruling was clearly erroneous or clearly against the preponderance of the evidence. *Churchill v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 530, 423 S.W.3d 637. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Dinkins v. Ark. Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001).

DHS argues that the evidence in this case shows that the children were placed at a substantial risk of serious harm "as a result of the mother's decision to focus on physically attacking [Ussery], rather than checking on the conditions of a child who had just fallen down a long flight of stairs and two other unattended toddlers in a vehicle." DHS contends that the circuit court's order erroneously focuses only on the actual fall of the baby, which was undisputedly an accident. But the court overlooked the circumstances surrounding the accident, including (1) Ussery's obvious intoxication, which Lewis was aware of; and (2)

Lewis's insistence that Ussery keep the baby, although Lewis had other options, including returning to her cousin's house with the children. DHS says that the circumstances surrounding this "accident" warranted protecting these children by bringing them within the supervision of the court so Lewis could receive reunification and parenting services.

Lewis counters that the children were never left alone, that she never lost sight of them, and that the baby was not injured by the fall. Lewis acknowledges the "unfortunate accident" and that her actions were "a poor reaction to the situation." She believes that the circuit court correctly determined that the children were not dependent-neglected and that DHS is asking this court to reweigh the evidence, which is improper.

There is no dispute that the baby's fall was an accident. Based primarily on the circuit court's credibility determinations, to which we must defer, we hold that the circuit court did not clearly err in finding insufficient evidence of dependency-neglect and dismissing this case.

Affirmed.

WHITEAKER, VAUGHT, and BROWN, JJ., agree.

HIXSON and MURPHY, JJ., dissent.

**KENNETH S. HIXSON, Judge, dissenting.** It is hard to disagree with anything in the majority opinion — except the last sentence. As you read the majority opinion or this dissent, count: one – two – three – four – five – six – seven – eight – nine – ten – eleven – twelve – thirteen – fourteen – fifteen. That is the number of stairs that the one-month infant tumbled and bounced down in a car seat to the gravel parking lot below in the rain at 5:00 a.m., leaving gravel, dust, and dirt on his face and forehead and causing the baby to

later have fixed eyes and vomit. Instead of even walking down the stairs to check on the infant, the mother chose to continue her altercation upstairs with the drunk father. The mother testified: "I failed to go down the stairs immediately, but I looked at my child, I seen my child. He was setting there and he was perfectly okay. The car seat was still sitting up." While the tumble may have been an accident, the conduct of the mother before and after was neglect. I would reverse and remand for further proceedings to include appropriate services to protect the children and assist Lewis with her parenting skills.

Murphy, J., joins.

*Andrew Firth*, Office of Chief Counsel, for appellee.

*Tabitha McNulty*, Arkansas Public Defender Commission, for appellant.