Cite as 2023 Ark. App. 45

# ARKANSAS COURT OF APPEALS
## DIVISION IV
No. CV-22-470

| | |
|---|---|
| NATAYAH HEGGINS | Opinion Delivered February 8, 2023 |
| APPELLANT | |
| | APPEAL FROM THE PULASKI |
| V. | COUNTY CIRCUIT COURT, EIGHTH |
| | DIVISION |
| | [NO. 60JV-22-177] |
| ARKANSAS DEPARTMENT OF | |
| HUMAN SERVICES AND MINOR | |
| CHILD | |
| APPELLEES | HONORABLE TJUANA C. BYRD, |
| | JUDGE |
| | |
| | AFFIRMED |

**RITA W. GRUBER, Judge**

Natayah Heggins appeals the May 25, 2022 order adjudicating her son, MC, dependent-neglected.[1] Heggins's sole point on appeal is that the circuit court committed reversible error when it adjudicated MC dependent-neglected pursuant to a subsection of the juvenile code that was not legally relevant to the undisputed facts. We affirm.

The Arkansas Department of Human Services (DHS) removed MC from Heggins's custody on March 8, 2022, exercising an emergency seventy-two-hour hold in response to a report of allegations of substantial risk of serious harm due to neglect and parental unfitness under Ark. Code Ann. § 9-27-303 (Supp. 2021) as well as aggravated circumstances. MC was

---

[1]Willie Ventress was identified as MC's putative father throughout the proceedings; however, he is not a party to the appeal.

approximately one year old at the time. DHS filed a petition for emergency custody and dependency-neglect on March 11, 2022. In support of its petition, DHS attached the affidavit of family service worker Cassandra Smith, setting out the previous contacts that had occurred between DHS and Heggins as well as the current allegations. An ex parte order for emergency custody was entered on March 11, 2022, and a probable-cause hearing took place on March 17 via Zoom. The circuit court found that there was probable cause to believe that the emergency conditions that caused the removal of MC from his mother's custody continued such that it was contrary to MC's welfare to be returned home, and it was necessary for, and in the best interest of, MC to continue in DHS's custody.

On April 28, 2022, an adjudication hearing was held via Zoom, at which Ventress, Dr. Clingenpeel, Cassandra Smith, Heggins, and Bridget Williams with Pulaski County Children and Family Services testified. Ventress testified that he believes he is MC's father; MC had never lived with him; Ventress had contact with MC through his (Ventress's) mother, including some overnight visits at the same time as Ventress's other children; he wanted to take a DNA test and wished to be involved in the case; and he had never paid child support but had provided financial assistance to Heggins when MC was first born through the purchase of a car seat, diapers, and clothing. Two exhibits were then admitted into evidence over the objections of Heggins's counsel: an Arkansas Children's Hospital Team for Children at Risk medical note and the case plan.

Dr. Clingenpeel testified that she saw MC at her clinic on November 3, 2021, because he was referred for a medical evaluation by the Arkansas State Police Crimes Against

Children Division (CACD) to evaluate skin lesions that had been reported as possible cigarette burns, along with allegations that Heggins smoked crack around MC.[2] Dr. Clingenpeel testified that she only diagnosed MC with a speech delay. A hair-shaft drug test was conducted on MC, which was positive for methamphetamine, THC, oxycodone, and cocaine, including the intact drug as well as two byproducts of cocaine, one of which indicated that the drug was taken into the body via inhalation or ingestion.

Dr. Clingenpeel further testified that when the primary caretaker is under the influence of those substances, it can cause the caretaker to have difficulty supervising a child adequately or creating a safe environment; there can be physical abuse due to the caretaker's poor impulse control while under the influence; there can be an increased risk of various forms of neglect, such as not feeding appropriately and not obtaining medical care as needed; and there can be emotional neglect of the child through the caretaker's failure to interact with the child in a way that is appropriate and nurturing and makes the child feel secure in his or her environment. On cross-examination, Dr. Clingenpeel clarified that the risks about which she testified were general and not specific to Heggins; MC was discharged to Heggins the day of the examination; MC appeared well nourished and well developed, save for the speech delay, and Heggins was generally very engaged with MC and receptive to education

---

[2]Smith's affidavit in support of the dependency-neglect petition set out that on November 1, 2021, there were allegations made against Heggins of abuse, neglect, and inadequate supervision of MC that were found to be true, and a protective-services case was opened, but services were not started.

during the visit. Dr. Clingenpeel had no information that MC was in the care of anyone other than Heggins.

Lewis Derrick Suttles testified that on the morning of March 6, 2022, he was leaving for church, walked out of his house, and saw a small child he did not know wearing nothing but a diaper and a shirt standing in his yard. It was drizzling, and Suttles grabbed the child immediately to make sure he was okay. Suttles asked two separate neighbors if they knew the child's family, but neither had seen the child before. A picture was then taken of the child and posted on Facebook to see if anyone knew him. After about ten minutes of not hearing anything, Suttles called the police. The police arrived and activated their sirens a couple of times to see if anybody would come out. About fifteen minutes later, Heggins came out by herself and claimed the child. Suttles denied any previous interaction with Heggins and estimated that twenty to thirty minutes had passed from the time Suttles found MC until Heggins appeared, but he did not know how long MC had been outside. Heggins told Suttles that she was grateful to him for finding her son.

Cassandra Smith testified that DHS had received two reports, one on February 14, 2022, for abuse[3] and the current report regarding inadequate supervision as testified to by

---

[3]Per Smith's affidavit in support of the dependency-neglect petition, on February 14, 2022, at 6:44 p.m., she received a report that Heggins beat MC on his leg; beat him when he was hungry and when he would not go to sleep; spent all of her money on "coke" and would snort "coke" in front of MC; got mean when she was high; sold pills and weed in front of MC; had been staying at a "coke" dealer's home due to being recently evicted, and had made a comment about putting an insurance policy on MC and putting "coke" up his nose to make him overdose to make it look like an accident since he was already hyperactive.

Suttles. The February 14 report stated that Heggins hit MC, used pills and weed in front of him, stayed with an apparent drug dealer, and put cocaine up MC's nose.

When the inadequate-supervision report came in, Smith used a Little Rock address from that report and went to it on March 8. Upon arrival, Smith saw MC inside the home, and he was screaming and banging his head on a glass door[4] so loud and for so long that it caused a neighbor to appear and to such a degree that it should have been heard by anyone inside. Smith knocked for approximately ten minutes, but no one came to the door, so Smith questioned the neighbor about who stayed at that home.

After about ten minutes, an adult female came to the door, grabbed MC, and took him away. Despite Smith's continuing to knock, no one answered, so Smith called law enforcement. Law enforcement arrived and knocked as well, with no answer. The officer noticed that the door was unlocked, and Smith entered the home with law enforcement, finding MC with a woman named Dorch. Smith was concerned about Dorch's behavior because she was "just kind of on and off" and her "moods were changing" and she was kind of "slurring." When asked why the child was alone, Dorch responded that she had been sleeping and kept saying she was tired. Dorch was asked to take a drug screen; she refused. Smith then took MC with her. Smith spoke with Heggins, who met her at the office for an interview.

---

Smith attempted to contact Heggins at an address and phone number, both of which were invalid.

[4]The glass door was the front door of the home, and there was another main door that was open that went into the home.

Smith showed the video she took that day to Heggins, who was very upset at what she saw. Smith and Heggins spoke about the CACD report from November 2021, which had resulted in a true finding for inadequate supervision. In discussing that investigation and the positive results of the hair-shaft test, Heggins at first did not remember it, but then she said that she had left the child with a babysitter and that it was her friend that was doing all the drugs.

Smith then testified that Heggins had reported that she had been living with her brother. Smith asked Heggins to take a drug test due to the allegations. Heggins admitted using THC and taking an ecstasy pill two days prior but denied any other drug use. Heggins took a drug screen, which returned positive for THC and methamphetamine. Smith further testified to the true finding from the March 6, 2022 investigation for neglect and inadequate supervision and that the seventy-two-hour hold was placed on MC March 8.

Smith clarified that no arrests were ever made in any of the incidents about which she testified; MC has never been found to be anything but well fed; and he had never been found by any medical professional to have been physically abused. Smith further confirmed that the November 2021 report contained true findings of neglect and inadequate supervision but not abuse; and despite MC's testing positive for multiple illegal drugs, DHS did not remove MC from Heggins's custody at the time, and services were supposed to have been started but were not. When asked why a safety plan was not put in place on March 8 as opposed to removing MC from Heggins, Smith testified that it was due to the previous findings of neglect and inadequate supervision, MC's positive hair-follicle test, Heggins's

positive drug screen, and her not having stable housing. Finally, Smith testified that no single incident rose to the level of removal but that two separate incidents of inadequate supervision and two separate incidents that indicated drug usage, in totality, rose to the level that MC would be at risk of harm if DHS did not intervene and place a hold on him.

Heggins testified next. She did not know why MC was positive for methamphetamine, oxycodone, or cocaine in November 2021, but she believed his exposure to narcotics must have occurred when he was with other people that she had selected to supervise him. Heggins denied having done cocaine or smoking marijuana around MC but admitted smoking cigarettes around MC and having previously taken an ecstasy pill. Dorch had been Heggins's girlfriend who she lived with from time to time, but they are no longer in a relationship. Heggins had never witnessed Dorch using any illegal substances and had believed that Dorch was an appropriate supervisor for MC.

Heggins further testified that she knew that the door at Dorch's house was broken, and she or Dorch normally put the couch in front of the door to block MC's access to it but that Dorch must not have done so that night. She denied that MC had ever gotten out of the door before. Heggins confirmed that MC was outside for a length of time, which put him at risk of harm. She admitted being treated for depression, PTSD, and anxiety but denied any anger issues or anger outbursts since the case began. Heggins testified that she wanted Ventress's mother to be considered as a possible placement for MC and requested that Ventress take a DNA test to establish paternity.

On cross-examination, Heggins testified that no one from DHS had ever reached out to help her before MC was taken; she believed she could keep MC safe; she has a safe and appropriate home; she was and had been employed at Burger King for the past two and half years and had been promoted to manager; she had plans to enroll MC in a state-licensed daycare and was asking for DHS's help with that; she already had her own counselor; and she had been in foster care herself as a child, and she did not want anyone from her family to be considered as a placement for MC. Heggins requested that the court dismiss the petition against her because there was no reason for DHS to take MC, and all she needed was daycare. Finally, Heggins testified that MC had stayed the night once with Ventress, and the rest with Ventress's mother; she did not know whether Ventress or his friends used any illegal substances; and she never knowingly put her child in harm's way.

North Pulaski County Administrator Bridgett Williams testified next. A case plan with a goal of reunification and a concurrent goal of placement with a fit and willing relative had been developed. As to services, Williams recommended drug-and-alcohol assessments for Heggins, random drug screens, therapy and medication management, services with Youth Villages, and stable housing. Williams recommended that MC stay in DHS's custody due, in part, to Heggins continuing to have contact with Dorch, even after MC had been taken into foster care. Williams recommended that Heggins maintain a period of sobriety as well as demonstrate her ability to keep MC supervised appropriately given his age. Williams further recommended unsupervised visitation at the DHS offices or supervised visits outside the DHS offices for both Heggins and Ventress and DNA testing for Ventress. Finally,

Williams testified that while MC had previously been placed with fictive kin, he had to be moved to a regular foster home because there was "a lot of drama" going on between the fictive kin placement, Heggins, and Dorch.

Williams testified further for dispositional purposes. Williams testified that she had not had any personal encounters with Heggins that caused her (Williams) concern for Heggins's mental health; DHS had been to Heggins's current home, which was very appropriate; and DHS had drug screened Heggins the day prior, which was positive for THC. Williams's concern with MC being returned home was due to the inadequate supervision that he has had in the past and some of the recent altercations and situations that Heggins has placed herself in since MC was taken into DHS custody. Williams further testified that while MC was in daycare and Heggins worked, there was still concern with Heggins's ability to provide a safe environment for MC. Those concerns included Heggins's judgment regarding her continued contact with Dorch, particularly given Heggins's belief that MC got the illegal substances in his system from Dorch, and since MC was taken into care, there had been an altercation between Dorch and Heggins in Heggins's home that resulted in the police being called.

The court then inquired further of Ventress, who testified that he wished to take a DNA test and that his mother be considered a placement for MC.

The adjudication and disposition order was entered May 25, 2022. In it, the circuit court found that Ventress has had significant contacts with MC; and Ventress shall be added as party to the proceedings and shall establish his legal paternity by DNA testing at DHS's

9

expense. Because the testing had not occurred, it was premature to place MC with him. The court further found that MC was dependent-neglected due to both neglect and parental unfitness by Heggins. In doing so, the court specifically found that Heggins had failed to appropriately supervise MC, who was less than two years of age, which resulted in MC's being left alone at an inappropriate age and in inappropriate circumstances, which created a dangerous situation or a situation that put MC at risk of harm. The court also found that MC had tested positive for multiple illegal substances and credited Dr. Clingenpeel's testimony. The court seemed particularly concerned about Dorch being MC's caregiver, considering Heggins's testimony that she believed that the drugs in MC's system were as a result of some conduct by Dorch; and Heggins's knowledge regarding the condition of the door in Dorch's home. The court cited the two separate instances in which MC was found outside or unsupervised as well as Heggins's drug use.

Regarding disposition, the circuit court found Heggins to be an unfit parent and determined that the return of MC to Heggins's custody was contrary to MC's welfare, and remaining in DHS custody was in his best interest. The court concluded that Heggins must protect her child from harm and have the insight and judgment to do so and that Heggins had not, insomuch as the evidence was that Heggins was still associating with Dorch despite all that had transpired. This timely appeal followed.

Adjudication hearings are held to determine whether the allegations in a petition are substantiated by the proof. Ark. Code Ann. § 9-27-327(a)(1)(A) (Repl. 2020). Dependency-neglect allegations must be proved by a preponderance of the evidence. Ark. Code Ann. § 9-

10

27-325(h)(2)(ii) (Supp. 2021). We will not reverse the circuit court's findings unless they are clearly erroneous. *McCord v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 244, at 8, 599 S.W.3d 374, 379. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* In reviewing a dependency-neglect adjudication, we defer to the circuit court's evaluation of the credibility of the witnesses. *Id.* This Court has also held that it will not reverse a circuit court's ruling "when an appellant fails to attack the trial court's independent, alternative basis for its ruling." *Trotty v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 557, at 7, 504 S.W.3d 636, 639.

A dependent-neglected juvenile is "any juvenile who is at substantial risk of serious harm as a result of the following acts or omissions to the juvenile . . . (v) Neglect; (vi) Parental unfitness . . . ." Ark. Code Ann. § 9-27-303(17)(A) (Supp 2021). A dependency-neglect adjudication occurs without reference to which parent committed the acts or omissions leading to the adjudication, as the juvenile is simply dependent neglected—there is no such thing as a "dependent-neglected parent." *Albright v. Ark. Dep't of Hum. Servs.*, 97 Ark. App. 277, 248 S.W.3d 498 (2007). Substantial risk speaks in terms of future harm to the child—not actual harm. *Bean v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 350, at 5, 498 S.W.3d 315, 318. Moreover, only one basis is necessary to support a dependency-neglect finding. *Samuels v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 2, at 9, 479 S.W.3d 596, 601 (affirming a dependency-neglect adjudication where appellant did not challenge one of the bases for doing so).

"Neglect" is defined in part as:

those acts or omissions of a parent, guardian, custodian, foster parent, or any person who is entrusted with the juvenile's care by a parent, custodian, guardian, or foster parent, including, but not limited to, an agent or employee of a public or private residential home, childcare facility, public or private school, or any person legally responsible under state law for the juvenile's welfare, that constitute: . . . [f]ailure to take reasonable action to protect the juvenile from . . . neglect, or parental unfitness when the existence of this condition was known or should have been known; . . . [f]ailure to appropriately supervise the juvenile that results in the juvenile's being left alone at an inappropriate age, creating a dangerous situation or a situation that puts the juvenile at risk of harm; or in inappropriate circumstances, creating a dangerous situation or a situation that puts the juvenile at risk of harm; [and the] [f]ailure to appropriately supervise the juvenile that results in the juvenile being placed in: inappropriate circumstances, creating a dangerous situation; or a situation that puts the juvenile at risk of harm . . . .

Ark. Code Ann. § 9-27-303(37)(A)(iii), (vii), (viii).

"Parental unfitness" is undefined in the Arkansas Juvenile Code; however, appellate courts have repeatedly held that parental drug use is sufficient evidence of parental unfitness. *Ark. Dep't of Hum. Servs. v. Jackson*, 2021 Ark. App. 464, at 7, 636 S.W.3d 806, 810 (citing *Garner v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 328, at 7, 603 S.W.3d 858, 862 ("While 'parental unfitness' is not defined in the statute, case law indicates that illegal drug use by a parent renders that parent unfit.")); *Hilburn v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 420, at 4, 558 S.W.3d 885, 888 ("Illegal drug use by a parent makes that parent unfit."). Parental unfitness is not necessarily predicated upon the parent's causing some direct injury to the child in question. *Bean*, 2016 Ark. App. 350, at 6, 498 S.W.3d at 318–19.

"If the circuit court finds that the petition has been substantiated by the proof at the adjudication hearing, a disposition hearing shall be held for the court to enter orders

12

consistent with the disposition alternatives." Ark. Code Ann. § 9-27-329(a). "In dependency-neglect proceedings, the disposition hearing may be held immediately following or concurrent with the adjudication hearing . . . ." Ark. Code Ann. § 9-27-329(c). "In initially considering the disposition alternatives and at any subsequent hearing, the court shall give preference to the least restrictive disposition consistent with the best interests and welfare of the juvenile and the public." Ark. Code Ann. § 9-27-329(d).

On appeal, Heggins contends that the dependency-neglect adjudication was reversible error because it was based upon an inapplicable subsection of the juvenile code. Specifically, Heggins argues that in its adjudication order, the circuit court faulted Heggins for "placing" MC with someone who then caused the minor child to be left alone rather than faulting Heggins for leaving MC alone *herself*. Heggins argues that this distinction is critically important because the language used by the circuit court in the adjudication order closely tracks the language in Ark. Code Ann. § 9-27-303(37)(A)(vii), which, according to Heggins, is inapplicable, rather than the arguably more appropriate subsection (viii). Heggins's argument is without merit.

First, Heggins's argument ignores that the first instance in which MC was discovered alone, which occurred at Dorch's home, occurred while MC was under the care and supervision of Heggins. Second, it ignores that the circuit court's order is not specific about which subdivision of Ark. Code Ann. § 9-27-303(37)(A) it was relying on to adjudicate MC dependent-neglected, Heggins failed to request a specific finding, and arguably, both subdivisions are appropriate under the circumstances. Finally, the circuit court found that

13

MC was dependent-neglected as a result of parental unfitness and neglect. Even assuming that Heggins's argument regarding the neglect basis is meritorious, she fails entirely to challenge the parental-unfitness basis.

Heggins relies on *Madore v. Arkansas Department of Human Services*, 2017 Ark. App. 296, 521 S.W.3d 172. In *Madore*, the mother experienced a mental deterioration resulting in hospitalization, but she never actually left her children alone; rather, she took them with her to the hospital out of concern, albeit borne out of a delusion. While both the mother and father tested positive for THC at the time DHS took custody of the children, the children were found to be well fed, well cared for, nurtured, healthy, happy, and clean. DHS filed its dependency-neglect petition alleging neglect and parental unfitness. The circuit court adjudicated the children to be dependent-neglected as a result of neglect only, finding that the children were left alone in inappropriate circumstances, despite testimony from a DHS investigator that there was no evidence that the mother had not appropriately supervised or cared for her children. This court reversed, holding that there was no evidence that the children had been left alone to satisfy the elements of neglect as set forth in the specific subsection relied on by the court.

Heggins also relies on *Arkansas Department of Human Services v. Lewis*, 2017 Ark. App. 140, 515 S.W.3d 176, in which this court affirmed the circuit court's denial of a dependency-neglect petition where it was undisputed that the child's fall was accidental, and the court explicitly found the mother's testimony to be credible. This court specifically noted that its

holding was "[b]ased primarily on the circuit court's credibility determinations, to which we must defer. . . ." *Id.* at 6, 515 S.W.3d at 179.

Heggins's reliance on *Madore* and *Lewis* is misplaced. Here, the credited testimony was that while in Heggins's care, one-year-old MC was found outside alone in his diaper in the rain in Suttles's yard after having wandered over at least two driveways for an unknown amount of time, but a minimum of twenty to thirty minutes, which put him at a substantial risk of serious harm. Heggins was also aware of the issue with Dorch's door; knew MC could get out of his crib; and after the first incident, knew MC could find his way outside, yet Heggins continued to let Dorch watch MC.

The circumstances were not such that there was one isolated incident. MC was found alone and unsupervised not once, but twice, while in or at the home of Dorch—with the second incident occurring only two days after the first—and MC being discovered by the DHS caseworker who was at the home due to the first report. Moreover, while DHS pled neglect and parental unfitness in *Madore*, the circuit court found the juvenile to be dependent-neglected only on the basis of neglect, whereas here, the circuit court found MC to be dependent-neglected due to both neglect and parental unfitness.

MC also tested positive for four different narcotics, and Heggins tested positive for two of the same: THC and methamphetamine. It was Heggins's belief that MC may have tested positive for the illegal substances due to being around people with whom Heggins chose to associate with and watch her child, including Dorch, but Heggins continued to permit Dorch to care for MC and continued to associate with Dorch herself, including after

MC had been taken into DHS custody. Heggins admitted smoking THC and "popping" ecstasy two days before MC was taken into DHS custody, and at the time of the adjudication hearing, Heggins was still testing positive for THC. Because only one basis for dependency-neglect is necessary, illegal drug use by a parent renders that parent unfit, and Heggins did not challenge the parental-unfitness basis on appeal, we affirm the dependency-neglect adjudication.

As to the disposition, Heggins makes a minimal argument that custody should be returned to her because her home is appropriate, she has been cooperative, and "there was no other history demonstrating that . . . [Heggins] was, herself, inappropriate as a caregiver." Certainly, Heggins is to be commended for having an appropriate home and cooperating, as well as for her ongoing and continual employment. However, this argument again ignores the drug usage, the continued contact with Dorch, and the fact that the more egregious of the two instances in which MC was found alone was on *her* watch. Heggins argues in the alternative that custody of MC should be placed with Ventress. The record does not reflect that any request was made to the circuit court to place MC with Ventress, and Ventress's status is as a "putative father," not as a "parent" as contemplated by the Juvenile Code and this court's precedents. *See* Ark. Code Ann. § 9-27-303(41); *Tovias v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 228, 575 S.W.3d 621. Ventress did not appeal. As such, the disposition is affirmed.

Affirmed.

WOOD and HIXSON, JJ., agree.

16

*Leah Lanford*, Arkansas Commission for Parent Counsel, for appellant.

*Marc D. Tave*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor child.